1
2
3
4
5
6
7
8                   **UNITED STATES DISTRICT COURT**

9                  **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   GUSTAVO MCKENZIE,                        CASE NO. 10cv01490-LAB
                                              (MDD)
12                            Plaintiff,
                                              REPORT AND
13         vs.                                RECOMMENDATION RE:
                                              DEFENDANTS' MOTION TO
14                                            DISMISS PLAINTIFF'S FIRST
                                              AMENDED COMPLAINT
15   SERGEANT G. ELLIS, JOHN
     MITCHELL, M. VORISE, W. TIETZ, T.
16   OCHOA, D. BELL and Does 1 and 2.
                             Defendants.      [Doc. No. 37]
17

18        Defendants' motion to dismiss Plaintiff's First Amended Complaint has been

19   referred pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c) of the United

20   States District Court for the Southern District of California.  For the reasons set

21   forth herein, it is recommended that Defendants' motion be **GRANTED IN PART**

22   and **DENIED IN PART**.

23   **I.      PROCEDURAL BACKGROUND**

24        Plaintiff Gustavo McKenzie, is a state prisoner currently incarcerated in

25   Calipatria State Prison ("Calipatria").  On July 14, 2010,  Plaintiff's civil rights

26   complaint ("Complaint") was removed from the Superior Court of California for the

27   County of Imperial  [Doc. No. 1].  In his Complaint, Plaintiff seeks relief under 42

28   U.S.C. § 1983 in connection with his request for a religious diet, which he contends

1   was never fully honored even though prison officials agreed he should receive such a

2   diet.  Id.  On November 22, 2010, Defendants filed a Motion to Dismiss the

3   Complaint.  (Doc. No. 19).  This Court issued a Report and Recommendation that

4   Defendants' Motion be granted in part and denied in part on July 18, 2011.  (Doc. No.

5   31).  On September 30, 2011, the District Court issued an Order adopting this Court's

6   recommendation, and dismissing the Complaint.  (Doc. No. 34).

7       On November 4, 2011, Plaintiff filed a First Amended Complaint ("FAC").

8   (Doc. No. 36).  Defendants filed the instant Motion to Dismiss on November 28, 2011.

9   (Doc. No. 37).  On December 29, 2011, Plaintiff filed a Response in Opposition to

10  Defendants' Motion.  (Doc. No. 39).  Defendants filed a reply on January 3, 2012.

11  (Doc. No. 40).

12  **II.    STATEMENT OF FACTS**

13      The facts are taken from Plaintiff's FAC and are not to be construed as

14  findings of fact by the Court.

15      Plaintiff  is currently incarcerated in Calipatria state prison.  (FAC).  He is

16  Rastafarian and due to his religious beliefs does not eat red meat or pork, but can eat

17  fish and poultry.  (FAC at 3).  When Plaintiff was first processed at the Delano

18  Reception Center, he was presented with the option to receive either a Kosher diet or

19  a religious vegetarian diet.  Id.  Plaintiff selected vegetarian, but advised Mr. Lopez,

20  the prison Chaplain who handled the meal request, that he also eats fish and poultry.

21  Id.  Mr. Lopez informed Plaintiff that he would be allowed to eat fish and poultry

22  whenever they were served on the menu, and presented Plaintiff with a religious diet

23  card a few days later.  Id.  Plaintiff was then placed in the general population at

24  Calipatria.

25      Plaintiff states that he received an appropriate religious diet until he was

26  transferred to Administrative Segregation Facility A4 on February 6, 2009.  (FAC at

27  4).  Upon his transfer to Administrative Segregation, Plaintiff notified Defendant

28  Ellis, the third-watch sergeant of building A4, of his religious dietary needs.  Id.

1   Officers taped a sign outside his cell reflecting his dietary requirements.  Id.  Despite

2   the sign, Plaintiff states he was served hot dogs in his cell the very next day by

3   Officer Soto.  Id.

4        Plaintiff complained, noting the sign outside his cell, at which point Soto left.

5   Id.  Soto returned fifteen minutes later with the same tray of hot dogs, saying that

6   Ellis had instructed him to return and to tell Plaintiff that the hot dogs were "chicken

7   hot dogs."  Id.  Plaintiff asked to speak to Ellis, but his request was denied.  Plaintiff

8   refused to eat the hot dogs and went without dinner that night.  Id.

9        Plaintiff filed a grievance about the incident, which was initially denied but

10  granted on appeal at the First Level of Review by Sergeant Rigney.  Id.  Even though

11  Plaintiff's grievance was granted, Ellis still refused to honor Plaintiff's religious diet,

12  stating that Plaintiff was not on the cook's list.  Id.

13       Before Plaintiff's first grievance was granted, he submitted another grievance

14  regarding the incident.  (FAC at 6).  The grievance was rejected and Plaintiff

15  continued to receive inappropriate meals.  Id.  On March 7, 2009, Ellis removed the

16  religious diet card from Plaintiff's cell door.  Id.  Ellis told Plaintiff that his religious

17  diet card would not be honored because it was issued at another institution.  Id.  On

18  March10, 2009, Plaintiff submitted a new grievance, prison log number A0900487

19  (the "487" grievance), regarding this incident.  Id.  In connection with his grievance,

20  Plaintiff requested an interview with John Mitchell, the "Correctional Food Manager"

21  at Calipatria.  In his request, Plaintiff stated that he had a religious diet card but

22  was wrongly being served red meat.  In response, Mitchell sent Plaintiff a letter

23  stating that Plaintiff had to fill out certain forms before he could receive a religious

24  diet, as the prison had no record of Plaintiff's participation in the religious diet

25  program.  Mitchell attached the required forms to his response and advised Plaintiff

26  to fill them out and return them.  Id.  Plaintiff did not sign or return the forms.  Id.

27  Instead, Plaintiff responded that he already had a religious diet card, and filed

28  another grievance (the 857 grievance).  Id.  Plaintiff also asked Mitchell to see him so

1  that he could show Mitchell his religious diet card.

2      On or about March 27, 2009, M. Vorise, the supervising cook, visited Plaintiff's

3  cell and informed Plaintiff that he was there on behalf of Mitchell.  Plaintiff showed

4  Vorise his religious diet card.  Vorise asked Plaintiff to sign the forms that Mitchell

5  had included in his response to Plaintiff's grievance, but Plaintiff again refused.  Id.

6  Vorise responded to Plaintiff's 857 grievance, stating that there was no evidence of

7  Plaintiff's participation in the religious diet program.

8      On May 13, 2009, Plaintiff was interviewed by W. Tietz, another supervising

9  cook.  Tietz explained to Plaintiff that Vorise's statement that there was no evidence

10  of Plaintiff's participation in the religious diet program was based on a review of

11  Plaintiff's central file, which lacked the required forms.  Tietz informed Plaintiff that

12  as of May 11, 2009, he has been registered in the religious diet program.  Id. at 12-13.

13      On May 15, 2009, Plaintiff was released from Ad Seg and transferred to

14  building B4.  On October 12, 2009, Plaintiff handed some mail he had composed to D.

15  Bell, the floor officer for building B4, for processing.  Instead of processing the mail,

16  Bell read Plaintiff's letter and then returned it.  Id.

17      On October 19, 2009, building B4 was placed on lockdown.  Since the floor

18  officers are in charge of feeding prisoners during lockdown, Plaintiff attempted to

19  speak to Bell and Myers, the other floor officer, and inform them of his dietary

20  restrictions.  Id.  When the two officers refused to listen to him, Plaintiff attempted to

21  speak to Sergeant Groth, but Groth also ignored him.  Throughout the lockdown, Bell

22  refused to honor Plaintiff's religious diet.  When the general population was being

23  served chicken or turkey, Bell would bring a regular tray for Plaintiff's cellmate, but

24  would bring Plaintiff a tray full of beans.  Id.  Bell would only give Plaintiff a regular

25  tray when fish was being served.  Bell continued to deny Plaintiff a religious meal

26  whenever the prison was placed on lockdown.

27  **III.   STANDARD OF REVIEW**

28      A Rule 12(b)(6) dismissal may be based on either a '"lack of a cognizable legal

theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" <u>Johnson v. Riverside Healthcare System, LP</u>, 534 F.3d 1116, 1121-22 (9th Cir. 2008) (quoting <u>Balistreri v. Pacifica Police Dep't</u>, 901 F.2d 696, 699 (9th Cir. 1990)).  In other words, the plaintiff's complaint must provide a "short and plain statement of the claim showing that [he] is entitled to relief."  Id. (citing Fed.R.Civ.P. 8(a)(2)).  "Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what ... the claim is and the grounds upon which it rests."  <u>Erickson v. Pardus</u>, 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007) (internal quotation marks omitted).

A motion to dismiss should be granted if the plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).

The court need not, however, accept as true allegations that are conclusory, legal conclusions, unwarranted deductions of fact, or unreasonable inferences.  <u>See Sprewell v. Golden State Warriors</u>, 266 F.3d 979, 988 (9th Cir. 2001); <u>Iqbal</u>, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); <u>Twombly</u>, 550 U.S. at 555 (on motion to dismiss court is "not bound to accept as true a legal conclusion couched as a factual allegation.").  "The pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation."  <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 555).

In addition, claims asserted by pro se petitioners, "however inartfully pleaded," are held "to less stringent standards than formal pleadings drafted by lawyers." <u>Haines v. Kerner</u>, 404 U.S. 519-20 (1972); <u>Erickson</u>, 551 U.S. at 94.  Because "Iqbal incorporated the Twombly pleading standard and Twombly did not alter courts'

treatment of pro se filings, [courts] continue to construe pro se filings liberally when evaluating them under Iqbal." <u>Hebbe v. Pliler</u>, 627 F.3d 338, 342 & n.7 (9th Cir. 2010) (citing <u>Bretz v. Kelman</u>, 773 F.2d 1026, 1027 n.1 (9th Cir. 1985) (noting that courts "have an obligation where the petitioner is pro se, particularly in civil rights cases, to construe the pleadings liberally and to afford the petitioner the benefit of any doubt.")).

In addition, when resolving a motion to dismiss for failure to state a claim, the court may not generally consider materials outside the pleadings, except for exhibits which are attached. <u>See</u> Fed.R.Civ.P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); <u>Schneider v. California Dept. of Corrections</u>, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998); <u>Jacobellis v. State Farm Fire & Casualty Co.</u>, 120 F.3d 171, 172 (9th Cir. 1997); <u>Allarcom Pay Television Ltd. v. General Instrument Corp.</u>, 69 F.3d 381, 385 (9th Cir. 1995). "The focus of any Rule 12(b)(6) dismissal ... is the complaint." <u>Schneider</u>, 151 F.3d at 1197 n.1. The court may also review "materials of which the court may take judicial notice." <u>Barron v. Reich</u>, 13 F.3d 1370, 1377 (9th Cir. 1994), including public records and "proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." <u>Bias v. Moynihan</u>, 508 F.3d 1212, 1225 (9th Cir. Nov. 2007) (quoting <u>Bennett v. Medtronic, Inc.</u>, 285 F.3d 801, 803 n.2 (9th Cir. 2002)).

## IV.   DISCUSSION

Plaintiff's FAC contains two counts, each containing claims against Defendants Ellis, Mitchell, Vorise, Tietz, and Bell ("Defendants"). In Count One, Plaintiff contends that Defendants violated his First Amendment rights when they refused to provide him with meals that met his religious dietary needs. (FAC at 3.) In Count Two, Plaintiff contends that Defendants violated the Equal Protection Clause of the Fourteenth Amendment when they refused to accommodate Plaintiff's Rastafarian diet. <u>Id.</u> at 17.

1    The Court will first address Plaintiff's First Amendment claims.  Next, the

2    Court will address Plaintiff's Fourteenth Amendment claims.  Finally, the Court will

3    determine whether Defendants are protected by qualified immunity.

4        **A.    Count One- First Amendment Claims**

5        In his FAC, Plaintiff claims that Defendants violated his First Amendment

6    rights in two ways.  First, he contends that his rights were violated when he was not

7    immediately placed on the religious diet list.  Plaintiff asserts that there was a delay

8    before he was placed on the religious diet list, and during that delay he was served

9    food he could not eat.  (FAC at 4).  Second, Plaintiff contends that even after the

10   delay was resolved, Defendants deliberately refused to provide him with religious

11   meals when he was placed in Administrative Segregation.  Id. at 6.[1]

12       In their Motion, Defendants contend that Plaintiff's First Amendment claim

13   based on a delay in receiving religious meals should be dismissed.  (Doc. No. 37 at 6).

14   Defendants do not challenge the adequacy of Plaintiff's claims that officers

15   deliberately refused to honor his diet once he was placed on the list.  Consequently,

16   the Court will not address those claims.

17       Defendants admit that there was a delay before Plaintiff was placed on a

18   religious diet program and that before his status in the program was confirmed he

19   received meals that did not conform to his religious beliefs.  Defendants contend,

20   however, that this delay did not violate the First Amendment.  (Doc. No. 37 at 5-7).

21   Defendants assert that prison regulations required Plaintiff to fill out forms and

22   verify his participation in the religious meal program.  In his Opposition, Plaintiff

23   counters that by refusing to timely honor his request for a religious diet, Defendants

24   _____

25       [1]Plaintiff also contends that Defendant Bell read and then refused to deliver mail
     that Plaintiff attempted to send to a friend.  Defendants move to dismiss this claim, but
26   Plaintiff clarifies in his Opposition that he is not bringing any claim against the
     Defendants for opening his mail.  Plaintiff asserts that he simply mentioned the incident
27   as part of the factual background of his claims and as further evidence that Defendants
     are intentionally discriminating against him.  Pursuant to Plaintiff's clarification, the
28   Court will not address this part of Defendants' Motion.

have interfered with his ability to practice Rastafarianism.  (Doc. No. 39 at 9).  In their Reply, Defendants contend that the delay was  reasonable under the circumstances and did not amount to a constitutional violation.  (Doc. No. 40 at 4-6).

### 1.    Regulations Requiring Prisoners to Register for Religious Diet Programs.

When a prison regulation impinges on an inmate's constitutional rights, such regulation is valid so long as it is reasonably related to a legitimate penological interest.  <u>Turner v. Safley</u>, 482 U.S. 78, 88 (1987).  This is a low level of justification which "is necessary if prison administrators..., and not the courts [are] to make the difficult judgments concerning institutional operations."  <u>Id.</u> (quoting <u>Jones v. North Carolina Prisoners' Union</u>, 433 U.S. 119, 128 (1977)).

The <u>Turner</u> court set four balancing factors to determine whether a prison regulation is reasonably related to legitimate penological interests:

> (1) Whether there is a "valid, rational connection between the prison regulation and the legitimate government interests; put forward to justify it";
>
> (2) Whether there are "alternative means of exercising the right that remain open to prison inmates";
>
> (3) Whether "accommodation of the asserted constitutional right" will have an effect on "guards and other inmates, and on the allocation of prison resources generally"; and
>
> (4)  Whether there is an "absence of ready alternatives" versus the "existence of obvious, easy alternatives."

<u>Turner</u>, 482 U.S. at 89-90, *(*quoting <u>Block v. Rutherford</u>, 468 U.S. 576, 586 (1984)).

Here, the regulations to be examined under <u>Turner</u> are the prison regulations requiring Plaintiff to register for a religious meal program, and requiring that Plaintiff's participation in the program be verified before he can receive religious meals.

**a.      The First Turner Factor**

The first Turner factor examines whether there is a "valid, rational connection between the prison regulation and the legitimate government interests put forward to justify it." Turner, 482 U.S. at 89.  The Ninth Circuit has indicated that the first factor is the most important.  see Morrison v. Hall, 261 F.3d 896, 901 (9th Cir. 2001).  Furthermore, the Ninth Circuit has explicitly recognized a valid interest in keeping food service simple and efficient.  Ward v. Walsh, 1 F.3d 873, 877 (9th Cir. 1993) (holding that a prison's interest in maintaining a simplified food service may allow the institution to provide a pork-free diet, instead of a fully kosher diet to a Jewish inmate).

The first factor weighs in favor of Defendants.  The prison has an interest in keeping food service simple and efficient.  Id.  The requirement that prisoners register for religious meal plans has a valid, rational connection to that interest as it ensures that special meals are only provided to inmates who require them, ensures that the correct meals are served to the correct inmates, and allows prison officials to efficiently administer the religious meal program to a large number of inmates.  Resnick v. Adams, 348 F.3d 763, 769 (9th Cir. 2003); Ward, 1 F.3d at 877.  Furthermore, according to his own FAC, Plaintiff repeatedly refused to fill out the forms to have himself placed on the religious diet program, exacerbating any delay caused by the religious diet program.

In his Opposition, Plaintiff counters that Defendants lied about his participation in the program, stating that the required forms were not in Plaintiff's central file when they already knew about Plaintiff's participation in the program.  (Opp. at 11-12).  Even accepting Plaintiff's contentions as true, it would not change the Turner analysis.  Turner examines whether the existing regulations are appropriate, not whether Defendants willfully violated those regulations.  Turner, 482 U.S. at 78.  Plaintiff's allegations that Defendants willfully denied him the appropriate meals are addressed further below.

1    Plaintiff also contends that the regulations are unnecessary because he showed
2    Defendants a religious diet card from the previous institution that housed him,
3    rendering further safeguards unnecessary.  (Opp. at 12).  In their Reply, Defendants
4    counter that the prison has an interest in ensuring that Plaintiff's previous card was
5    legitimate, accurate, and still in effect.  (Reply at 5).  Defendants note that such cards
6    do not last for indefinite periods, are easily forged as they contain no official seals,
7    symbols, signatures, or pictures, and require corroboration.  Id.  The Court agrees
8    that the prison has an interest in verifying Plaintiff's participation in a religious diet
9    program.  Ward, 1 F.3d at 877.  Accordingly, this factor weighs in favor of
10   Defendants.

11              **b.      The Second Turner Factor**

12   The second Turner factor examines whether Plaintiff could practice his religion
13   in other available ways.  Defendants contend that before Plaintiff started receiving
14   his religious diet, he simply could have avoided eating pork and red meat when it was
15   served to him.  (Doc. No. 37 at 6).  Plaintiff asserts that he would "starve" if not
16   allowed to eat the main portions of his meals, while Defendants counter that "the
17   non-pork and beef portions of the menu surely would provide enough nutrition to
18   Plaintiff while Calipatria officials underwent the necessary procedures to
19   permanently provide Plaintiff with Rastafari-compliant food."  Id.  Defendants also
20   note that Plaintiff could continue to engage in many of the other forms of religious
21   expression he described in his FAC, including daily prayers, giving thanks, and
22   religious discussion.  Id.  In his Opposition, Plaintiff does not address whether he had
23   alternative methods of expressing his religion, but rather repeats his contention that
24   Defendants are lying about when he began to receive an appropriate diet.  (Opp. at
25   13).

26   The second factor weighs in favor of Defendants.  While Plaintiff contends that
27   the meals he was served caused him to starve, that is irrelevant to the Turner
28   analysis.  The second factor only examines whether Plaintiff had alternative methods

of expressing his religion.  <u>Ward</u>, 1 F.3d at 877; <u>see</u> <u>also</u> <u>Shakur v. Schriro</u>, 514 F.3d 878, 886 (9th Cir. 2008).  Plaintiff does not allege he was denied all means of religious expression, and accordingly this factor weighs in favor of Defendants.

### c.   The Third <u>Turner</u> Factor

The third <u>Turner</u> factor examines whether accommodation of the Plaintiff's needs would affect guards, other inmates, or prison resources generally.  Defendants contend that allowing inmates such as Petitioner to "dictate religious meal restrictions without the proper documentation would force officials to alter the meal program and resources to accommodate daily, unforeseen changes, and thereby heavily burden the system."  (Doc. No. 37 at 6-7).  Defendants contend that being required to tailor each prisoner's diet to his liking would consume a great deal of time and resources.  <u>Id.</u>  In his Opposition, Plaintiff counters that he already had his religious diet card when he arrived at Calipatria, and there is no burden to the prison in simply honoring it.  (Opp. at 13).  In their Reply, Defendants contend that the prison cannot honor diet cards they did not issue, as the prison would be required to honor counterfeit cards that would unduly burden prison staff and resources.

This factor weighs in favor of neither party.  In <u>Shakur</u>, 514 F.3d at 878, a Muslim inmate requested a Kosher diet when he began to suffer health problems from his vegetarian diet.  The Ninth Circuit found that without detailed and specific statements about the cost that would be incurred to the prison as a result of accommodating the plaintiff, summary judgment was inappropriate.  <u>Id.</u> at 887.

Here, while the Defendants likely face some burden given the specificity of Plaintiff's dietary requests, the extent of that burden is unknown.  The Ninth Circuit has stated that "[c]ommen sense tells us that there would be some disruption to the efficient operation of culinary services if the prison were required to provide a special meal for one prisoner.  <u>Ward</u>, 1 F.3d at 878.  Nevertheless, without specific statements detailing how the burden on Defendants is more than de minimis, this factor cannot weigh in favor of either party.  <u>Shakur</u>, 514 F.3d at 878

1

### d.    The Fourth <u>Turner</u> Factor

2      The fourth <u>Turner</u> factor considers whether or not easily implemented

3   alternatives to the prison's current policy are available.  The absence of ready

4   alternatives to the prison policy is evidence that the policy is reasonable.  <u>Turner</u>, 482

5   U.S. at 90-91.  "But if the inmate claimant can point to an alternative that fully

6   accommodates the prisoner's rights at *de minimis* cost to valid penological interests,

7   a court may consider that as evidence that the regulation does not satisfy the

8   reasonable relationship standard."  <u>Id.</u>

9      In their Motion, Defendants contend that the current system is simple and

10  effective.  Inmates request a special diet through standardized forms, and after their

11  request is verified, the inmate is placed on the religious dietary list and served

12  appropriate meals.  (Doc. No. 37 at 7).  In his Opposition, Plaintiff does not suggest

13  any alternatives to the policy currently in place.  In light of the absence of ready

14  alternatives, this factor weighs in favor of Defendants.

15

### e.    Conclusion

16      Considering all four <u>Turner</u> factors, Plaintiff has failed to state a valid claim

17  for violation of his First Amendment rights.  Three of the four factors weigh in favor

18  of Defendants, and the remaining factor weighs in favor of neither party.  Defendants

19  have established that there is a rational, legitimate purpose behind the regulations

20  requiring Plaintiff to register for a religious diet program.  <u>Turner</u>, 482 U.S. at 88.

21  Plaintiff acknowledges that he has been placed on the appropriate list, and that he

22  repeatedly refused to cooperate with the regulations by filling out the required forms.

23  Accordingly, the Court **RECOMMENDS** that Defendants' Motion be **GRANTED,**

24  **and** Plaintiff's claim that prison regulations requiring that he register for the

25  religious meal program violate his First Amendment rights be **DISMISSED** without

26  prejudice.

27

### 2.    Remaining Claims Against Defendants Mitchell,

28  **Vorise, and Tietz**

- 12 -

1    Defendants also move to dismiss all of Plaintiff's claims under Count One as to

2  Defendants Mitchell, Vorise, and Tietz.  (Doc. No. 37 at 7).  Defendants contend that

3  Plaintiff has failed to show how these Defendants are casually connected to the

4  alleged constitutional violations.  Id.

5    A person deprives another "of a constitutional right, within the meaning of §

6  1983 if he does an affirmative act, participates in another's affirmative act, or omits

7  to perform an act which he is legally required to do that causes the deprivation of

8  which [the plaintiff complains]."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

9  A plaintiff must show how each defendant's personal involvement or conduct caused

10  the constitutional violation.  King v. Atiyeh, 814 F.2d 565, 568 (9th Cir. 1987).

11    Defendants contend that the only interaction Defendants Mitchell, Vorise, and

12  Tietz had with Plaintiff was when they responded to Plaintiff's Inmate Appeal Form.

13  (Doc. No. 37 at 8).  Defendants assert that Mitchell, Vorise, and Tietz "merely

14  responded to Plaintiff's Inmate Appeal and took associated actions."  Id.  Defendants

15  contend that their actions were limited to informing Plaintiff that his file did not

16  show participation in the religious meal program, providing Plaintiff with the

17  requisite forms, and explaining how the forms should be filled out.  Id.  According to

18  Defendants, at no point did they intentionally or with deliberate indifference deny or

19  delay Plaintiff's participation in the religious meal program, and therefore cannot be

20  liable for any resulting constitutional violations.

21    Plaintiff contends that these Defendants were directly responsible for any First

22  Amendment violations because they were made aware that Plaintiff already had a

23  religious diet card, but still refused to serve Plaintiff a religious diet.  (Opp. at 14-15).

24  In his FAC, Plaintiff states that, as part of a grievance, he sent a letter to Defendant

25  Mitchell informing him that he already had a religious diet card.  (FAC at 6).

26  Mitchell sent Plaintiff a response indicating that Plaintiff needed to fill out certain

27  forms, which Mitchell attached to the response, before he could be added to the

28  religious diet program.  Id.  Mitchell had no further contact with Plaintiff.

After receiving Mitchell's response, Plaintiff filed another grievance about his religious diet.  On or about March 27, 2009, Defendant Vorise visited Plaintiff's cell and asked that Plaintiff fill out the required forms.  Plaintiff showed Vorise his religious diet card, but refused to fill out the forms.  Id.  Vorise later responded to Plaintiff's grievance, stating that there was no evidence of Plaintiff's participation in the religious diet program.  After that response, Vorise had no further contact with Plaintiff.

Shortly after that meeting, Plaintiff filed another grievance and was interviewed by Defendant Tietz. Tietz responded to Plaintiff's claim that because Vorise had seen Plaintiff's diet card, Vorise must have lied when he stated there was no evidence of Plaintiff's participation in the program.  In their interview, Tietz explained to Plaintiff that Vorise's statement was based on a review of Plaintiff's central file only, and that the file lacked the required forms that had been presented to Plaintiff by Defendants Mitchell and Vorise.  Tietz also informed Plaintiff that he had been placed on the religious diet program.  That interview was Tietz's only contact with Plaintiff.

Plaintiff has failed to state a valid claim against these Defendants.  As an initial matter, prison officials cannot be liable for their mere involvement in a prison appeals process. Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988).  There is no right to a timely or effective inmate grievance procedure, and failure to follow procedural requirements for handling an appeal, even when those requirements are mandatory, does not subject prison officials to liability under § 1983. Smith v. Noonan, 992 F.2d 987, 989 (9th Cir. 1993).  Furthermore, according to Plaintiff's own FAC, Defendants Mitchell and Vorise timely responded to Plaintiff's grievances and provided him with the necessary paperwork to be placed in the religious diet program.  Defendant Tietz simply interviewed Plaintiff and explained that, at the time Vorise interviewed Plaintiff, Plaintiff's central file lacked the required forms.  Plaintiff can point to no specific act by any of these Defendants that caused his participation in the religious

1   meal program to be delayed or denied.  Plaintiff's conclusory assertion that

2   Defendants lied is insufficient to maintain his claim.  Iqbal, 556 U.S. at 678.

3   Defendants statements regarding Plaintiff's participation in the prison diet program

4   related to forms that Plaintiff repeatedly refused to sign, and not to his religious diet

5   card.  While Plaintiff believes that the card should be enough to qualify him for the

6   religious diet program, he does not accuse Defendants of crafting or violating the

7   prison regulations requiring corroboration for cards issued at other institutions.

8        In his Opposition, Plaintiff further contends that the Defendants deliberately

9   delayed his placement on the religious diet list.  (Opp. at 15).  Plaintiff asserts that

10  Sergeant Rigney directed Defendant Tietz to place Plaintiff on the religious diet list

11  on March 30, 2009, but that he was not actually added to the list until May 11, 2009.

12  Id.  These conclusory assertions do not rescue Plaintiff's claim.  Plaintiff points to no

13  specific act by any Defendant that caused any delay.  Rather, materials attached to

14  Plaintiff's FAC show that Defendants promptly addressed Plaintiff's grievances, kept

15  him informed of his status, and placed him in the religious diet program despite his

16  refusal to fill out the required paperwork.  Plaintiff's allegation that Defendants were

17  responsible for any delay is vague and conclusory, and accordingly is insufficient to

18  maintain Plaintiff's claim.  Iqbal, 556 U.S. at 678.[2]

19       Plaintiff brought identical claims against these Defendants in his original

20  Complaint.  This Court recommended, and the District Court agreed, that Plaintiff's

21  original claims should be dismissed as to these Defendants as Plaintiff had not pled,

22  with sufficient particularity or clarity, any specific action that could give rise to

23  liability.  Though Plaintiff has provided some additional factual background in his

24  FAC, he has not provided any new information regarding these Defendants that

25

26       [2]Plaintiff's claim that he was not placed on the religious diet list until May 11,
    2009, is also contradicted by materials Plaintiff previously presented to the Court.  In
27  his original Complaint, Plaintiff provided the Court with a copy of Calipatria's response
    to his 487 grievance. (Doc. No. 1 at 24).  The response indicates that Plaintiff had been
28  placed on the religious diet list as of March 30, 2009.  Id.  Plaintiff did not attach this
    response to his FAC, though he does include the underlying grievance.

10cv-01490-LAB (MDD)

1    would materially alter his original claims.

2         Because the factual allegations against Defendants Mitchell, Vorise, and

3    Tietz are deficient, the Court **RECOMMENDS** that Defendants' Motion be

4    **GRANTED** as to Plaintiff's claims in Count One of his FAC against Defendants

5    Mitchell, Vorise, and Tietz, and that those claims be **DISMISSED** without prejudice.

6           **B.**      **Count Two- Fourteenth Amendment**

7         In Count Two of his FAC, Plaintiff contends that Defendants violated the

8    Equal Protection Clause of the Fourteenth Amendment when they refused to provide

9    him with a meal option specific to his Rastafarian religion. (FAC at 17). Specifically,

10   Plaintiff requests that "red meat be substituted with an alternative protein(s) items,

11   (could be peanut butter, or cheese, which is always available)" but with "no beans, as

12   beans gave me gas and ultimately a bacteria in my lower-stomach- 'H-Pylori.'" Id.

13   Plaintiff also requests that be given a regular (non-vegetarian) meal whenever fish,

14   chicken, or turkey are served. Id. Plaintiff contends that Defendants' refusal to

15   provide him with a customized meal plan, even though Jewish and Muslim inmates

16   receive Kosher and Halal meal plans, is a violation of the Equal Protection Clause of

17   the Fourteenth Amendment.

18        In their Motion, Defendants assert that Plaintiff's Fourteenth Amendment

19   claim fails as it provides no more than a conclusory allegation of discrimination.

20   (Doc. No. 37 at 9). In his Opposition, Plaintiff reiterates that his claim is based on

21   the prison's refusal to craft a Rastafarian-specific menu. Plaintiff asserts that he is

22   only provided a vegetarian option, while Jewish inmates and Muslim inmates are

23   provided meal plans that include Kosher meat and Halal meat respectively. (Opp. at

24   16).

25        The Fourteenth Amendment provides that no state shall "deny to any person

26   within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

27   The Equal Protection Clause requires the state to provide a prisoner with "a

28   reasonable opportunity of pursuing his faith comparable to the opportunity afforded

1   fellow prisoners who adhere to conventional religious precepts." Cruz v. Beto, 405
2   U.S. 319, 322 (1972).  The state is not allowed to give differential treatment
3   depending on religious beliefs, but must "treat all similarly situated people equally."
4   See City of Cleburne Living Center, 473 U.S. 432, 439 (1985).

5        In some situations, the refusal to provide an inmate with a religious diet may
6   violate the Fourteenth Amendment.  For example, in Shakur, 514 F.3d at 878, a
7   Muslim plaintiff complained of disparate treatment when he was offered a vegetarian
8   meal plan, and denied Halal or Kosher meat, either of  which are allowable in his
9   religion.  Id. at 891.  Shakur stated that the vegetarian diet caused him severe
10  stomach problems, which interfered with his religious exercise.  Id.  Shakur
11  requested a meat-based alternative protein source, and argued that the Kosher diet,
12  which included Kosher meat, would be acceptable.  Id.  In their response, defendants
13  claimed that providing Shakur and other Muslims with Kosher meat was too
14  expensive, and that the vegetarian diet plan was acceptable.  Id.  While the court
15  acknowledged that providing Shakur with Halal or Kosher meat would cause the
16  prison to incur additional cost, the court found that the cost was no greater than that
17  incurred to provide Jewish inmates with Kosher meat.  Id.  The Court applied the
18  four part Turner test, and found that there was not sufficient information on the
19  record to determine under the third and fourth Turner factors whether placing
20  Shakur on the alternative kosher diet would put more than a de minimis burden on
21  the prison.  Accordingly, the court found that  summary judgement on that claim was
22  inappropriate.  Id.

23       Here, Plaintiff has stated a cognizable claim under the Fourteenth
24  Amendment.  Plaintiff alleges that certain religious groups are offered diets
25  containing meat, while Rastafarians are not.  Accepting Plaintiff's FAC as true,
26  Rastafarian inmates have fewer dietary options than Muslim or Jewish inmates, and
27  do not have the option to receive meat.  Even though Plaintiff does not allege that his
28  current diet violates his religious beliefs, it is sufficient that he asserts that

Rastafarian inmates are discriminated against and given inferior dietary options. Cruz, 405 U.S. at 322; City of Cleburne, 473 U.S. at 439. This may not necessarily amount to a violation of the Fourteenth Amendment. As in Shakur, that question ultimately requires the Court to consider the burden of accommodating Rastafarian inmates as compared to the restraint on the Plaintiff's religious expression. The Court does not have sufficient information to make that determination at this stage of the pleadings.[3]

Accordingly, the Court **RECOMMENDS** that Defendants' Motion be **DENIED** as to Plaintiff's Fourteenth Amendment claim.

### C. Qualified Immunity

Defendants also contend that even if Plaintiff's claims are otherwise valid, they must still be dismissed as Defendants are protected by qualified immunity. (Doc. No. 37 at 9).

Qualified immunity protects "government officials... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity does not protect a defendant when: (1) the defendant's action violated a federal constitutional right; and (2) the right was clearly established at the time of the conduct at issue. LSO, Lt. V. Stroh, 205 F.3d 1146, 1157 (9th Cir. 2000). A qualified immunity defense is generally not amenable to a motion under Rule 12(b)(6) because facts necessary to establish an affirmative defense generally must be shown by matters outside the complaint. See Morley v. Walker, 175 F.3d 756, 761 (9th Cir. 1999) (holding that, in light of court's duty to accept allegations in the complaint as true, a finding of qualified immunity in

---

[3]In their Reply, Defendants contend that Plaintiff's claim fails because he has not shown that the delay in receiving a religious diet infringed his Fourteenth Amendment rights. (Reply at 7). This misconstrues Plaintiff's claim as presented in his FAC. While Plaintiff's Fourteenth Amendment claim in his original Complaint dealt with delay, he clarifies in his FAC that his claim is based on the prison's policy of providing diets that include meat to some religious prisoners, but not to Rastafarians.

10cv-01490-LAB (MDD)

1   a motion to dismiss is inappropriate).  While a ruling on immunity "should be made

2   early in the proceedings so that the costs and expenses of trial are avoided where the

3   defense is dispositive[,]" (Saucier v. Katz, 533 U.S. 194, 199 (2001)), the court is

4   usually "not equipped at this stage to determine whether qualified immunity will

5   ultimately protect [the defendant].  Those issues must be resolved at summary

6   judgment or at trial."  Id.; see also Groten v. California, 251 F.3d 844, 851 (9th Cir.

7   2001).

8           In Dunn v. Castro, 621 F.3d 1196, 1199 (9th Cir. 2010), the Ninth Circuit

9   emphasized that qualified immunity is "a right not merely to avoid standing trial, but

10  also to avoid the burdens of such pretrial matters as discovery." (internal citations

11  omitted).  Therefore, when the record is clear that the official had a reasonable belief

12  that his conduct was lawful, a court may properly dismiss a claim on the basis of

13  qualified immunity.  See Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir.

14  1993).

15          First, qualified immunity does not apply to Defendants Ellis and Bell.  Plaintiff

16  alleges that both Defendants undertook deliberate, discriminatory action designed to

17  prevent Plaintiff from receiving an authorized religious diet.  No officer could view

18  such conduct as reasonable, and accordingly these Defendants are not entitled to

19  qualified immunity.  Malley v. Briggs, 475 U.S. 335, 341 (1986).

20          Second, as to Defendants Mitchell, Vorise, and Tietz, a qualified immunity

21  determination is inappropriate at this time.  Groten, 251 F.3d at 851 (9th Cir. 2001).

22  The only remaining claims against these Defendants are Plaintiff's Fourteenth

23  Amendment claims as presented in Count Two of his FAC.  It is not clear from

24  Plaintiff's FAC that these Defendants held a reasonable belief that their actions were

25  lawful.  Id.  While Defendants assert that they simply followed prison guidelines, this

26  is not clear from the face of Plaintiff's FAC.

27          Accordingly, the Court **RECOMMENDS** that Defendants' Motion be **DENIED**

28  as to Defendants' claim that they are protected by qualified immunity.

# VI. CONCLUSION AND RECOMMENDATION

For all of the foregoing reasons **IT IS HEREBY RECOMMENDED** that the Court issue an Order:

(1) **APPROVING AND ADOPTING** this Report and Recommendation;

(2) **GRANTING** Defendants' Motion as to Plaintiff's claim that a delay in being placed on a religious diet program violates the First Amendment, and **DISMISSING** that claim without prejudice.

(3) **GRANTING** Defendants' Motion as to Plaintiff's First Amendment claims against Defendants Mitchell, Vorise, and Tietz, and **DISMISSING** those claims without prejudice.

(4) **DENYING** Defendants' Motion as to Plaintiff's Fourteenth Amendment claim.

(5) **DENYING** Defendants' Motion as to a qualified immunity defense.

**IT IS FURTHER ORDERED:**

This report and recommendation will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) (1988).  Any party may filed written objections with the court and serve a copy on all parties by **June 5, 2012**.  The document shall be captioned "Objections to Report and Recommendation."  Any reply to the objections shall be served and filed by **June 19, 2012**.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

The parties are advised that failure to file objections within the specific time

may waive the right to raise those objections on appeal of the Court's order.  <u>Martinez</u>

<u>v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED**.

DATED:  May 15, 2012

Hon. Mitchell D. Dembin
U.S. Magistrate Judge

- 21 -